**BUSBY v. JONES.**

No. 10227.

Court of Civil Appeals of Texas. San Antonio.

Jan. 19, 1938.

Rehearing Denied Feb. 16, 1938.

Boone, Henderson, Boone & Davis, of Corpus Christi, for appellant.

Sidney P. Chandler, of Corpus Christi, for appellees.

MURRAY, Justice.

Appellee, Grace E. Jones, a feme sole, instituted this suit in the district court of Nueces county for the Twenty-Eighth judicial district of Texas, against Nowlin Collier and wife, Dollie Collier, and J. J. Busby, seeking to recover upon an alleged vendor's lien note in the sum of $1,630.45, signed by Nowlin Collier and Dollie Collier. She also sought to foreclose an alleged vendor's lien against 280 acres of land situated in Nueces county; the legal title to the land being in J. J. Busby at the time the suit was filed.

The trial was to a jury, but at the close of the testimony each side made motions for an instructed verdict. Appellant's motion was overruled, but appellee's motion was granted, and the court instructed the jury to return a verdict in favor of appellee, Grace E. Jones, establishing and foreclosing a lien upon the land in controversy, securing the payment of the sum of $3,018.58, with interest at the rate of 7 per cent. per annum from that date until paid, and to return a verdict in favor of defendant J. J. Busby on his cross-action against Nowlin Collier, I. N. Conyers, and Wiley Davis for the sum of $3,018.58, with interest at the rate of 7 per cent. per annum from said date until paid.

The jury returned a verdict accordingly, and judgment was entered on March 18, 1937, in accordance with said verdict, in favor of appellee, Grace E. Jones, establishing her debt in the sum of $3,018.58, with interest thereon at the rate of 7 per cent. per annum from the 1st day of March, 1937, as a valid and subsisting debt and establishing a lien upon said land in controversy as a valid and subsisting lien, inferior and subordinate to a prior lien of Guaranty Title & Trust Company, and inferior and subordinate to a prior lien of the San Antonio Joint Stock Land Bank; for foreclosure on said tract of land, as such lien existed on July 17, 1923, as against defendants Nowlin Collier, Dollie Collier, and J. J. Busby; for an order of sale, writ of possession, etc. (no personal judgment was rendered against Busby), to which judgment appellant, J. J. Busby, then and there duly excepted. The court also entered judgment, as prayed in the alternative by Busby, that he have judgment against Nowlin Collier, I. N. Conyers, and Wiley Davis for said sum of $3,018.58, with interest and costs of suit. To which judgment Nowlin Collier and I. N. Conyers excepted. J. J. Busby alone has prosecuted this appeal.

The facts involved in this case are somewhat complicated, but we will endeavor to state them as fully as possible:

In July, 1923, H. B. Baldwin conveyed to Nowlin Collier and his wife, Dollie Collier, 280 acres of land, described as the south half of section 305, of the F. Z. Bishop subdivision of the Brayton tract in Nueces county, and as part consideration the Colliers executed to Baldwin ten vendor's lien notes for $1,000 each, of even date with the deed, numbered consecutively from 1 to 10; Note No. 1 being payable on October 1, 1924, note No. 2 maturing October 1, 1925, and the other notes maturing one each year on October 1st thereafter. The note sued on herein is alleged to be a renewal of notes Nos. 1 and 2 of the above-described series of ten notes.

H. B. Baldwin transferred these ten notes to the Guaranty Title Company on October 2, 1923. On the same date Nowlin Collier and wife sold and conveyed the 280 acres of land to Wiley Davis, who assumed the payment of the ten notes. A payment of $539.55 was made on note No. 1 on October 7, 1924. On September 3, 1925, Wiley Davis, acting by I. N. Conyers as his agent, made a written contract with appellant, J. J. Busby, to sell and convey said land to Busby for an aggregate consideration of $37,800. Of this consideration, $22,646.50 was to be paid by assuming indebtedness outstanding against the land. The record shows that $12,600 of this indebtedness was due to the San Antonio Joint Stock Land Bank, and the remaining $10,046.50 was apparently the amount represented by the Baldwin notes. It seems, however, that there was an attempt being made to refinance a part of this indebtedness, and a loan in the sum of $16,000 had been applied

for to Earson and Taft, and apparently, therefore, this $22,646.50 indebtedness was described in the contract as being $16,000 due to Earson and Taft, and $6,646.50 due to the Guaranty Title Company.

On the trial Busby testified that he had learned, before he received title to the 280 acres of land, that the attempted refinancing of the loan with Earson and Taft had fallen through.

On October 28, 1925, Wiley Davis filed suit against Busby in the district court of Nueces county to restrain Busby from entering the premises; Busby answered on November 25th, seeking affirmative relief in the performance of the above contract, and on December 30, 1925, he filed a lis pendens notice of the pendency of said suit and of his answer and cross-action seeking such affirmative relief. This suit was cause No. 8170, and was tried and judgment rendered on March 5, 1926, in which Busby was given specific performance of his contract with Davis. The judgment required Busby to assume the indebtedness above described, and likewise required Davis to execute a warranty deed conveying the 280 acres of land to Busby. Busby was also required to pay the other consideration described in the contract.

After the contract between Busby and Davis had been entered into, but before it had been performed, notes Nos. 1 and 2 of the series of notes held by the Guaranty Title Company became due, and that Company demanded payment of the same. In October, 1925, I. N. Conyers, as agent for Wiley Davis, paid notes Nos. 1 and 2 to the Guaranty Title Company. The notes were marked paid and delivered to Conyers, and by Conyers delivered to Davis. Davis thereafter reimbursed Conyers for the amount paid on said notes Nos. 1 and 2. No release of these notes was executed or recorded. I. N. Conyers obtained, from the Guaranty Title Company, in June, 1926, a transfer to himself of said notes Nos. 1 and 2; the transfer expressly subordinating the lien securing the same to the remaining notes held by the Guaranty Title Company and the lien securing the indebtedness due the bank. This transfer was filed for record by Conyers on July 17, 1926. On May 24, 1927, Conyers got Nowlin Collier and wife, Dollie Collier, to execute to him a renewal note of notes Nos. 1 and 2, in the principal sum of $1,630.45, being the amount due on notes Nos. 1 and 2, less the payment of $539.55. This renewal note was payable to I. N.

Conyers, or order, on or before October 1, 1928, with interest from date until paid at the rate of 7 per cent. per annum. On the same date, to wit, May 24, 1927, Collier and wife executed and acknowledged an instrument to Conyers purporting to renew and extend the time of payment of the debt evidenced by said notes Nos. 1 and 2, and also extending the lien securing the payment of said notes. This extension agreement, after setting forth the usual provisions found in such agreements, recites:

"and we, Nowlin Collier and wife, Dollie Collier, have this day executed our new note in the principal sum of One Thousand Six Hundred Thirty Dollars and Forty Five Cents for the purpose of a renewal of said notes One and Two and to pay accrued interest on the same, and said renewal note, it is understood, is to take the place of said notes One and Two and said lien on said property to have the same preference as to priority as if it were made at the time that said Notes Number One and Two, were made, and subject to the provisions of a transfer made by H. B. Baldwin as President of the Guaranty Title Company to I. N. Conyers on the 23rd day of June, A. D. 1926, *no personal liability on Makers*. Witness our hands at Robstown, Texas, this 24th day of May, A. D. 1927.

"Nowlin Collier
"Dollie Collier" (Italics ours).

The phrase *"no personal liability on Makers,"* contained in the extension agreement, is the cause of much of the contention of the parties in this case. Appellant contends that the effect of this clause was to relieve Nowlin Collier and his wife from any personal liability on the renewed note, while it is the contention of appellee that said clause is meaningless, or that it has some reference to provisions in the transfer from H. B. Baldwin, as president of the Guaranty Title Company to I. N. Conyers.

On August 26, 1927, and before the maturity date of this alleged renewal note, I. N. Conyers sold and transferred the renewal note to Grace E. Jones, for a valuable consideration, and it is upon this note that appellee, Grace E. Jones, instituted this suit.

Appellant contends that said notes Nos. 1 and 2 had been fully paid and the lien securing their payment thereby extinguished before the attempted transfer of these two notes by the Guaranty Title Company to Conyers, and also before the execution

of the alleged renewal note and extension agreement executed by Collier and wife, and that therefore the alleged renewal note is invalid. Appellant contends that it was a fraud for Conyers to go back to the Title Company and secure a transfer of these notes to himself and thereafter secure a renewal note from Collier and wife, after said notes had been paid by him, and the notes marked paid and delivered to him, and after Davis had reimbursed Conyers and Conyers had delivered to Davis the two original notes; and especially in view of the fact that the Colliers had sold the land, and in view of the further fact that the extension agreement contained a provision that there should be *no liability on makers*.

■ Appellant concedes, however, that if Grace E. Jones was an innocent purchaser, in due course, of the renewal note, she would be entitled to recover irrespective of Conyers' fraud. We are of the opinion that Grace E. Jones was an innocent purchaser of this note. There is no contention that she acted in bad faith in purchasing the note. It is conceded that she conveyed her home in Kingsville to Conyers and accepted this note as part payment for that home. She testified, in effect, on the trial that at the time she purchased the note she had no knowledge of any facts which would render the note invalid. Appellant contends that the fact that he was in possession of the land was sufficient to place appellee on inquiry, and that if she had made inquiry of him before purchasing the renewal note he would have informed her that he was contending that this indebtedness had been fully paid. We cannot agree with this contention; there was nothing inconsistent in the existence of this renewal note and Busby's possession of the land. His possession of the land in no way put appellee on notice of the nonexistence of the lien. In R. B. Templeman & Son v. Kempner, Tex.Civ.App., 223 S.W. 293, 296, writ refused, the court said: "Appellee's possession was taken under her deed from Baker, whose record title to the land at the time he executed the original deed of trust is not questioned. Having acquired Baker's title, and the land being subject to appellants' lien at the time she placed her deed on record and took possession, her possession was not adverse to appellants' claim of lien. As the owner of the land, she was entitled to possession, and appellants have at no time been entitled to pos-

session. Upon these facts it is obvious that appellee's possession was not adverse to appellants' claim of lien, and could not affect their right to a foreclosure of the lien."

■ Appellant further contends that his lis pendens notice in cause No. 8170, between himself and Davis, was also notice to appellee of his contention that notes Nos. 1 and 2 had been fully paid. We also overrule this contention. The alleged renewal note was in every respect a negotiable promissory vendor's lien note, and there was nothing upon the face of the note to indicate that it was in any way defective. Grace E. Jones, in purchasing this note, negotiable on its face, was not required to make inquiry, and where she purchased the same in good faith, before maturity, for a valuable consideration, she is an innocent purchaser of the same, unless it be shown that she had actual knowledge of defects in the note, or that she had knowledge of such facts as would render her action in purchasing the note bad faith. In the case of West v. First Baptist Church of Taft, Texas, 123 Tex. 388, 71 S.W.2d 1090, 1096, it is said: "Judge Garrett, in Wilson v. Denton, 82 Tex. 531, 535, 18·S.W. 620, 622, 27 Am.St.Rep. 908, thus stated and explained the settled rule in this state and in practically all of the other states, and of which section 56 of article 5935 is but a restatement: 'The ordinary rule of constructive notice which applies to the purchaser of property is not applicable in the case of negotiable instruments. As promotive of their circulation, a liberal view is taken, which makes the bona fides of the transaction the decisive test of the holder's right. *He is entitled to recover upon it if he has come by it honestly*. Greneaux v. Wheeler, 6 Tex. [515], 525; 1 Daniel, Neg.Inst. § 775. It matters not how the vendor came in possession of the bill or note, whether by theft or fraud or honestly. The title of the transferee does not depend upon the title of the vendor, but upon his possession; and if the buyer has acted in good faith, and paid a valuable consideration, his title cannot be impugned. An early English case (Gill v. Cubitt, 3 Barn. & C. 466) laid down the principle that, although the holder had given value for the bill or note, yet, if he took it under circumstances which ought to have excited the suspicions of a prudent and careful man, he could not recover. This was a departure from the earlier rule, which re-

garded the bona fides as the crucial test by which it was to be determined whether or not the purchaser should be protected against defenses that would be valid against the transferrer of the note. But the earlier rule was soon again reverted to, and afterwards made even more liberal; and *it became the law that, while gross negligence might be evidence tending to show mala fides, and, as such, admissible, it did not in itself amount to proof of mala fides, and was not sufficient to deprive the holder of his right to recover.* If it should be left to a jury to determine as to the degree of caution which a prudent man must exercise on taking such an instrument, it would lead to much perplexity, and to frequent injustice. Thus is the law deduced from the English decisions by Mr. Daniel in his admirable work on Negotiable Instruments (section 770 et seq.).' (Italics ours.)"

█ Appellant next contends that the renewal note and the extension agreement having been executed at one and the same time, the two taken together constituted one transaction, and the provision in the extension agreement, "no personal liability on Makers," was sufficient to put appellee on notice that the note was not a negotiable instrument. There is no reference in the note to the extension agreement and the record does not show that appellee knew anything about the extension agreement prior to the time she purchased the renewal note. During the trial she was asked if she got the extension agreement at the same time she got the renewal note; to which she answered, yes; but the record does not show whether this occurred before or after she had purchased the note. She was later asked this question by the attorney for appellant: "Q. When you bought that note did you know that Mr. Nowlin Collier and his wife were not personally liable on that note, and had stated in their transfer, that they were not to be personally liable on the note? A. No, I didn't." The attorney later explained that he meant the extension agreement rather than the transfer, and she again answered in the negative.

██ There is no evidence in the record showing that Grace E. Jones did have knowledge of any infirmities of the renewal note. It is true that she is a party to the suit, but her positive evidence, that she did not know of these alleged defects in the renewal note, not being contradicted by any evidence, was sufficient to justify the court, under all the facts in this case, in holding that she was in fact a bona fide holder, in due course, for value, before maturity of the note sued on, and to instruct a verdict in her favor. Furthermore, we are of the opinion that, even if it had been proven that appellee had before her the extension agreement before she purchased the renewal note, this would have been insufficient to put her on notice that such note was not negotiable. The clause contained in the extension agreement, to wit, "no personal liability on Makers," seems to be almost meaningless in the manner in which it is tacked on at the end of the extension agreement. The renewal note was an absolute and unqualified promise by Collier and wife to pay the sum specified in the note. The extension agreement was likewise an ordinary extension agreement, containing the usual and customary provisions of such an agreement, and we cannot hold, under the circumstances, that the clause, "no personal liability on Makers," appearing in the manner in which it appears in this extension agreement, would be sufficient to render meaningless the plain and unequivocal promise by Collier and wife to pay the sum specified in the renewal note. This being true, even if Miss Jones saw the extension agreement before she purchased the note, such fact would not prevent her from recovering in this case.

Appellant cites us to Wood v. Sparks, Tex.Civ.App., 42 S.W.2d 142; Id., Tex. Com.App., 59 S.W.2d 361, 362, Id., Tex. Com.App., 63 S.W.2d 1109, and contends that the facts in that case are similar to the facts in this case. With this we cannot agree. It is expressly stated in the Wood-Sparks Case that the "promissory note" contained a provision that, "The liability on and payment of this note is subject in all things to the terms of mechanic's and material man's lien contract between the parties hereto of even date, to which reference is made as a part hereof." When you turn to the mechanics' and materialmen's lien contract you find that there is a plain unequivocal provision that the mortgage company is not to be held liable on the note. In the case at bar there was no reference in the renewal note to the fact that any other instrument had been simultaneously executed with the note; and then when you refer to the extension agreement, you find a very vague statement which appellant attempts to

have construed as meaning that the Colliers would not be personally liable on the renewal note. These distinguishing facts render the case at bar a very different case from the Wood-Sparks Case.

Appellant also refers to the case of Fidelity Trust Co. v. Fowler, Tex.Civ. App., 217 S.W. 953. In that case it was shown that the purchaser had both instruments before it, before it acquired the note. Such fact is not shown in the case at bar.

Finding no error in the record, the judgment will be in all things affirmed.